**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| **MICHAEL ALLEN and NATHAN SCOTT HARRIS**<br>　　　*Plaintiffs,* | §<br>§<br>§ | |
| **v.** | § | **No. 7:16-CV-00047-RAJ** |
| **PRIORITY ENERGY SERVICES, LLC**<br>**and PRIORITY WELL TESTING, LLC**<br>　　　*Defendants.* | §<br>§<br>§<br>§<br>§ | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AGAINST PLAINTIFF MICHAEL ALLEN**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant Priority Well Testing, LLC[1] ("Priority" or "Defendant") and files this Motion for Summary Judgment on Plaintiff Michael Allen's claim for overtime pursuant to the Federal Labor Standards Act ("FLSA"), and would respectfully show the Court the following:

## I.　　INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Michael Allen was a highly-compensated Level 6 Senior Operator ("Senior Operator") who supervised a crew performing well testing services for Priority. Given Allen's supervisory, high-level job duties, Priority classified him as exempt from the FLSA's requirements and paid him a generous salary plus bonuses.[2] Indeed, by virtue of his job title and

---

[1]　　Although Priority Energy Services, LLC is a named Defendant in this action, Priority Energy Services, LLC disputes that it was Plaintiff Michael Allen's employer.

[2]　　Allen earned a monthly salary of $4,000, plus bonuses. *See Allen's Answers to Defendants' First Set of Interrogatories*, attached hereto as ***Exhibit A***, at 11; *Excerpts from the Deposition of Allen*, attached hereto as ***Exhibit B***, at 108:1–21. It is undisputed that Priority paid Allen at a rate of well over $100,000 per year. While Allen did not work at Priority for the entirety of 2013 or 2014, he still qualifies for the highly qualified exemption

1

duties, Allen was paid more than lower level operators and received superior benefits, too. While business was booming, Allen was apparently pleased making six-figures and enjoying the perks that accompanied his supervisor status.  After resigning from Priority and holding several other jobs, however, Allen hired an attorney to bring this case for alleged unpaid overtime compensation.  For the reasons set forth herein, Allen's overtime claim fails as a matter of law. Allen was hired as a Level 6 Senior Operator to lead Priority's well testing crew.  He was a true manager who supervised both his designated crew and individual well testing jobs.  During all relevant time periods, Allen was exempt from the overtime requirements of the FLSA as a highly compensated, executive, and administrative employee.

According to Allen, during the time he worked at Priority, he was the "lead man" on the job.  *Exhibit B*, at 181:21–22; 182:5–6.  Naturally, he was the face of the company while he and his crew performed well testing work.  Moreover, Allen was selected to supervise a crew, in part, because of his extensive experience with well testing and troubleshooting, qualifying him to direct lower-level employees regarding well testing-related tasks.  *See id.* at 182:5–15; 15:19–25; 16:4–9; 16:19–24.  As the Senior Operator in the field, he was the person on the crew with the skills needed to operate, assess, and analyze the testing of the extracted product and conduct necessary troubleshooting.  *See id.*  He was tasked with—and used his own independent

---

for both years because he received a pro rata portion of at least $100,000 based upon the number of weeks that he was employed in 2013 and 2014.  Specifically, in 2013, Allen was paid a total of $74,438.86 in taxable wages. *Affidavit of Debra King*, attached hereto as *Exhibit D*, at *Exhibit D-1* and *Exhibit D-2*.  He worked for Priority for approximately 32 (thirty-two) weeks in 2013.  *See Exhibit B*, at 90:17–92:7.  Were he to continue to receive the same weekly salary, he would have been paid over $120,000 in 2013.  Moreover, in 2014, Allen was paid a total of $29,960.88 in taxable wages, and he worked for Priority for approximately eight (8) weeks.  *See Excerpts from Allen's Priority Employment Application*, attached hereto as *Exhibit D-3*; *Exhibit B*, at 90:17–92:7.  Had Allen continued to receive the same weekly salary, he would have been paid over $194,000.

judgment and discretion to—communicate with clients regarding the well testing, identify problems, and recommend solutions. *See id.* at 45:23–46:3 (providing an example of a situation wherein he gave the company man advice regarding the handling of issues on the well site).

Allen earned an annual pro rata compensation of over $100,000 and performed job duties satisfying not just one, but all elements of the executive and administration exemptions. Thus, Allen was, at all relevant times during his employment, exempt from overtime under the highly compensated, executive, and administrative exemptions. Numerous courts have found employees in similar positions exempt from overtime. The result should be no different here.

Finally, in the unlikely event the Court finds that Priority has not established these exemptions as a matter of law, given the overall scope of Allen's job, he should nevertheless be deemed exempt under a combination of these overtime exemptions, under 29 C.F.R. § 541.708.

## II.    ARGUMENT AND AUTHORITIES

### A.    Summary Judgment Standard

Summary judgment is proper in a case in which there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 442 (5th Cir. 2009). A defendant who seeks summary judgment on an affirmative defense must adduce evidence supporting each element of the defense and demonstrate the lack of any genuine issue of material fact with regard thereto. *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1075 (E.D.

Tex. 2011) (citing *Celotext. Corp. v. Catrett*, 477 U. S. 317, 322 n. 3 (1986)).  Summary judgment is mandated if the nonmovants fail to make a showing sufficient to establish the existence of an element essential to their case on which they bear the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2004).

**B.     Allen Was Properly Classified as Exempt Under the Highly Compensated Employee, Executive, Administrative, and Combination Exemptions.**

The FLSA requires employers to pay employees overtime at one and one half times their regular rate for all hours worked over forty (40) in a workweek. 29 U.S.C. § 207.  If an employee works in a bona fide administrative or executive capacity, however, no overtime pay is required. 29 U.S.C. § 213(a)(1); *Gellhaus*, 769 F. Supp. 2d at 1077; *see Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 492 (5th Cir. 2003), *cert. denied*, 540 U.S. 938 (2003).   Furthermore, even where an employee meets only one of the requirements for the administrative or executive exemptions, he is still exempt if he is a highly compensated employee whose primary duties include the performance of office or non-manual work.  29 C.F.R. § 541.601(a), (b)(1), (d).

**1.     Allen Was Exempt as a Highly-Compensated Employee.**

The  undisputed  evidence  establishes  that  Allen  worked  as  a  highly-compensated employee who performed executive and administrative job duties.  *See Exhibit A*, at 11; *Exhibit B*, at 90:17–92:7; 108:1–21; *Exhibit D*.[3]  A high level of compensation is a strong indicator of an employee's  exempt  status,  "**thus eliminating the need for a detailed analysis of the employee's job duties.**"  29 C.F.R. § 541.601(c) (emphasis added).   The highly compensated

---

[3]     Detailing Allen's pay records, employment dates, and establishing that he made over $100,000 per year on a pro rata basis during both years of his employment.

4

exemption applies to employees (1) whose total annual compensation, including bonuses, is $100,000.00 or more,[4] (2) who regularly and customarily perform at least one of the duties of an executive, administrative, or professional employee; and "whose primary duties include performance of office or nonmanual work."   *Id.* § 541.601(a), (b)(1), (d); *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 Fed. App'x 349, 359 (5th Cir. 2015).  If an employee works for less than a full year, he still qualifies if he is paid a "pro rata portion" of the $100,000 based on the number of weeks worked.  29 C.F.R. § 541.601(b)(3).  Allen meets each requirement.

**"An employee may qualify as a highly compensated executive employee . . . if the employee customarily and regularly directs the work of two or more other employees, even though the employee does not meet all of the other requirements for the executive exemption under § 541.100."**  *Id.* § 541.601(c) (emphasis added).  Because Allen was paid more than $100,000 pro rata on an annual basis,[5] a less stringent analysis applies, and Priority need only establish that Allen performed office or non-manual labor and that he customarily and regularly performed *one of the duties* of an exempt executive or administrative employee, discussed at length below.  Because Allen meets not just one, but elements of an executive and administrative employee, he easily meets the requirements of the highly compensated exemption.

2.      **Allen Meets the Executive Exemption Requirements.**

Allen's position falls squarely within the executive exemption to the FLSA's overtime provisions.  An employee qualifies as an exempt executive when the following criteria are met:

- The employee's primary duty is management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof;

---

[4]        Including at least $455.00 per week paid on a salary or fee basis.  § 541.601(b).
[5]        *See **Exhibit A**, at 11; **Exhibit B**, at 90:17–92:7; 108:1–21; **Exhibit D-3***.

- The employee customarily and regularly directs the work of two or more other employees; and
- The employee has the authority to hire or fire other employees or the employee's suggestions or recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

*Id.* § 541.100; *see id.* § 541.601(c).

> **(a)**     ***Allen's primary duty was management of Priority's well testing services.***

At all times relevant to Allen's employment, Priority had various divisions that provided numerous services, including Artificial Lift, Coil Tubing, Equipment Rentals, Nitrogen Services, Portable Flashbacks, Well Testing, Wireline Services, and Vacuum Services. *See Declaration of Alex Duplechin,* attached hereto as ***Exhibit C***, ¶ 2.   Allen was employed by Priority as a Level 6 Senior Operator in the well testing division from May 21, 2013 to February 27, 2014. *See* ***Exhibit B,*** at 90:17–92:7.  When Allen applied for this position, he stated he was applying for a "supervisor" position. *Id.* at 91:15–17.[6]

During the time Allen was employed by Priority, employees in the well testing division were organized into independent "crews," each generally comprised of a senior operator and helpers. *See* ***Exhibit B***, at 30:25–31:21.  Well testing crews performed their job functions at client worksites and operated as a distinct unit independent from other Priority crews. ***Exhibit C***, ¶ 2–4.  As a matter of law, a unit of business that has a "permanent status and function" is a recognized department or subdivision. § 541.103(a). "A recognized department or subdivision may move from place to place and the subordinate personnel may change, as long as the 'unit'

---

[6]     Notably, Allen actually sought out a supervisory position and knew he would be a supervisor because he applied for a "Well Test Supervisor" position. *See* ***Exhibit D-2***.  Allen also represented to Priority on his employment application that he had been employed as a supervisor at nearly every one of his jobs since July of 2004. *See id.*

6

has a continuing function." *Allen v. Coil Tubing Servs., LLC*, 846 F. Supp. 2d 678, 708 (S.D. Tex. 2012) *aff'd*, 755 F.3d 279 (5th Cir. 2014) (internal quotations and citations omitted). Allen's well testing crew was a separate and independent unit with a permanent status and function. **Exhibit C**, ¶ 2; *see Carranza v. Red River Oilfield Servs., LLC*, No. H–15–3631, 2017 WL 387196, at *4 (S.D. Tex. Jan. 27, 2017) (finding crews that moved from place to place to perform customer projects were a customarily recognized subdivision); *King v. Stevenson Beer Distrib. Co.*, 11 F. Supp. 3d 772, 782 (S.D. Tex. 2014) (same); *Allen*, 846 F. Supp. 2d at 708 (same). An employee may be exempt under the executive exemption even if the workers he supervises come from a pool or other recognized unit so long as "other factors are present that indicate that the employee is in charge of a recognized unit with a continuing function." 29 C.F.R. § 541.103(d); *see Pruitt v. Sherrod Servs., L.L.C.*, No. W-12-CV-103, 2012 WL 12874902, at *2 (W.D. Tex. Nov. 9, 2012). Priority consistently and continuously relied on Allen's well testing crew to perform the well testing services offered by the Company, which was part of Priority's revenue-generating business at all times relevant to Allen's employment. As such, Allen's well testing crew had a permanent status and continuing function.

Next, FLSA regulations define "primary duty" as the "principal, main, major, or most important duty" that the employee performs, which is determined "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). A non-exhaustive list of factors to be considered when determining the primary duty include: "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom

7

from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

Executive employees have management as a "primary duty." *Id.* § 541.100(a)(2). "Management" duties include, but are not limited to:

> [I]nterviewing, selecting, and training of employees; . . . directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; . . . planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used[;] . . . .  providing for the safety and security of the employees or the property. . . .

*Id.* § 541.102.  Allen's primary duty was clearly management of his well testing crew and of the individual well testing jobs.  As the Senior Operator in the field on each job, Allen was the "lead man."  ***Exhibit B***, at 181:21–22; 182:5–6.  Allen described his duties as a Senior Operator as "push[ing] the people on the particular job site, making sure that everything goes the way . . . procedurally [that] it was given to [the lead man]." *Id.* at 182:2–5.  Notably, because of Allen's supervisory position, Priority paid him more and provided him superior employment benefits than members of his crew—which is a factor considered by courts in making exemption determinations.[7] *See **Exhibit C***, ¶ 4; ***Exhibit B***, at 45:1–9.  "A person in a management position necessarily, by virtue of that position, receives benefits that . . . an hourly worker does not receive." *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 867 (N.D. Tex. 2001).

---

[7]     Priority provides Senior Operators with company vehicles.  ***Exhibit B***, at 37:23–38:3.  Even in situations where mid-level or junior operators were provided with company vehicles, Senior Operators enjoyed the benefit of not having their vehicles taken to be used to haul equipment or employees during busy times. *Id.* at 44:10–21.  The Senior Operator always had his vehicle with him. *Id.*

Furthermore, unlike mid-level operators, as a Senior Operator, Allen had the authority to choose the hands for his crew.  *Id.* at 32:2–9; 34:5–19; 36:2–5.  In fact, Priority actually relied on the Senior Operator to determine the best hands and necessary equipment for the job in order to provide a satisfactory performance for its clients.  *Id.* at 34:7–14; 36:2–5.  Priority trusted the judgment of Senior Operators, like Allen, because of their extensive experience.  *Id.* at 34:15–19. Per Allen's own testimony, a Senior Operator was "the senior guy on site who everybody depends on to fix stuff and all of that."  *Id.* at 71:14–17; *see also id.* at 45:14–19 (noting Senior Operator was the first person who has to assess equipment issues and formulate solutions).

Allen's testimony demonstrates that an important aspect of his job was managing the crew, which was a job only someone with extensive field experience could perform.  *Id.* at 182:5–15 (noting that extensive experience was required to properly conduct testing on extracted product and troubleshooting); *id.* at 15:19–25 ("[I]f you can sufficiently do that, then they will put you as a lead on a job."); *id.* at 16:4–9 ("You don't want a hand just coming out, trying to . . . run the separator."); *id.* at 16:19–24 ("[A]s far as troubleshooting . . . they leave that up to me"). On the worksite, Allen appeared to be the supervisor, boss, or person in charge.  *Id.* at 190:18–20.  Importantly, Allen had day-to-day supervisory control over his crew, as he:

- directed the work of the hands on his crew (*Id.* at 163:5–11);
- explained fracking process and gave advice/feedback to hands (*Id.* at 59:1–14; 60:5–12);
- was responsible for the company equipment and ensuring its delivery to and removal from the job sites (*Id.* at 80:4–81:6);
- participated in the planning of the work with the field supervisor and general manager (*Id.* at 36:6–37:7);
- acted as the intermediary between the company man and Priority's general manager, salesman, or field supervisor (*Id.* at 79:3–16);
- could make recommendations for hiring (*Id.* at 144:23–25);
- reported issues relating to employees' poor performance and made recommendations for removal and replacement of employees on his crew (145:9–146:1; 184:13–25);

9

- handled personnel issues, to the extent possible, dealing with the hands (*Id.* at 77:4–11);
- conducted troubleshooting and provided troubleshooting instructions to other operators in need of help (*Id.* at 16:17–17:1; 39:16–41:7; 45:10–13);
- was the "eyes and the ears" for the company man and field supervisor, providing accurate reports and acting as the "boots on the ground" at the site (*Id.* at 37:8–20; 46:15–24).

In fact, Allen himself described his primary duties as supervisory and managerial in his employment application to Premier Flow Control, LLC, which was one of Allen's employers after he left Priority. *See Allen's Premier Flow Control Employment Records*, attached hereto as **Exhibit E**. Allen specifically wrote that at Priority, his responsibilities included "**oversee[ing] all sight [sic] operations, such as Frac Flowbacks, Drill Outs, coordinate employee schedule, preparing invoicing and inventory management**." *Id.*

When presented with similar facts in similar cases, other courts in the Western District have had little difficulty in determining that the employees qualified for the executive exemption. For example, *Pruitt* involved overtime claims brought by a dispatcher who led defendant's projects on client worksites and supervised a crew of employees. 2012 WL 12874902, at *5–7. There, some of plaintiff's job duties included selecting crews and equipment for the sites, getting trucks and equipment to the sites, advising the owners about employees and applicants, instructing new employees on job duties, making disciplinary notations, and finding replacement drivers if necessary. *Id.* The Court granted summary judgment in favor of defendant, concluding plaintiff's primary duties were managerial. *Id.* The result should be the same here.

Defendant anticipates that Allen will contend that his primary duties did not include managerial responsibilities either because he reported to the field supervisor and company man on various matters, or because he spent time performing non-exempt duties. However, there is no genuine issue of material fact here regarding Allen's primary duties being managerial. First,

"[t]ime alone . . . is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work."  29 C.F.R. § 541.700(b). Employees who spend less than fifty  percent (50%) of their time performing exempt duties may still meet the primary duty requirement.  *Id.*  Therefore, what is determinative here is that Allen's principal, most important duty was managing his crew and the well testing services that Priority provided.  *See Allen*, 846 F. Supp. 2d at 706 ("To determine an employee's primary duty, the Court looks to the job responsibilities that are 'of principal value to the employer.'") (citing *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1232 (5th Cir. 1990)).

Second, although the evidence does not establish that Allen had to obtain approval on many issues, **courts have found that employees may fall under the executive exemption even when their supervisors must *regularly* approve their managerial decisions**.

> If final decision-making authority were the test for determining whether a person was an executive or administrative employee, one would rarely, if ever, qualify as such an employee under the regulations.  Indeed, there is often a hierarchy in any organization wherein supervisors have persons to whom they must report, and the fact that an individual does not have final supervisory authority does not take that person out of the realm of being a manager in the organization.

*Gellhaus*, 769 F. Supp. 2d at 1082 (internal citations omitted); *see Aguirre v. SBC Commc'ns, Inc.*, No. H-05-3198, 2007 WL 2900577, at *21 (S.D. Tex. Sept. 30, 2007) (holding that plaintiffs' primary duties were managerial even though they were subject to direct oversight in exercising  some important managerial functions), *aff'd*, 299 F. App'x 315 (5th Cir. 2008); *Kastor*, 131 F. Supp. 2d at 867 (finding bakery manager was exempt even though his supervisor worked in the same location and had to approve a number of decisions, including scheduling overtime, hiring and firing, and rearranging the department).  Thus, Allen cannot prove that his primary duty was anything other than managing the employees on his crew.

11

**(b)**   ***Allen directed the work of two or more full-time employees.***

Throughout his employment, Allen customarily and regularly[8] directed the work of at least two other full-time hourly employees.  Allen testified that when there was more than one well pad on a job site, the number of employees he was "responsible for" increased.[9]  ***Exhibit B***, at 164:2–18.  Allen further testified that both the job tickets and number of well pads would provide evidence of the number of employees on a job.  *Id.* at 214:12–15; 215:14–17.  According to Priority field tickets, Allen supervised the work of approximately fourteen (14) different employees at various times throughout his employment.  *See Priority Field Tickets*, attached hereto as ***Exhibit D,*** at D-3.  Allen worked as part of a hierarchy in which he could be called upon to supervise a large number of employees—and, in fact, oftentimes *was* called upon to supervise many different individuals.  Accordingly, Allen customarily and regularly directed the requisite number of Priority employees.  *See, e.g., Simmons v. City of Fort Worth, Tex.*, 805 F. Supp. 419, 426 (N.D. Tex. 1992) (finding plaintiffs were exempt executive employees after noting "[e]ach of the fire deputy chiefs supervise between fifteen and 186 other fire department

---

[8]     "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or onetime tasks." 29 C.F.R. § 541.701. The phrase "two or more other employees" means two full-time employees or their equivalent. *Id.* § 541.104(a). For example, one full-time and two half-time employees are equivalent to two full-time employees. U.S. DEP'T OF LABOR, *Fact Sheet #17B: Exemption for Executive Employees Under the Fair Labor Standards Act (FLSA)*, (July 2008), *available at* https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0ahUKEwjftM-qkfnOAhXBOCYKHUtpAZAQFggeMAA&url=https%3A%2F%2Fwww.dol.gov%2Fwhd%2Fovertime%2Ffs17b_executive.pdf&usg=AFQjCNGsmq1i0caCzDyqVJkmzsNIH4EHqg&sig2=KO0hqXbOc3LU9W5pEYjQ_g&bvm=b v.131783435,d.eWE.  "The supervision can be distributed among two, three, or more employees." *Id.*  For example, a department with five (5) full-time nonexempt workers may have up to two (2) exempt supervisors if each supervisor directs the work of two (2) of those workers. *Id.*

[9]     These services were typically provided by crews consisting of two or more people per shift, including a combination of "drilling hands" or "hands," lower-level operators and higher-level operators. ***Exhibit B***, at 30:25–31:21.  Whether working with a two-man crew or a three-man crew, the senior-level person was the one who handled issues as they arose.  *See Exhibit B*, at 164:19–165:7.  Importantly, Plaintiff was hired as a Level 6 Senior Operator and was the Senior Operator throughout his employment with Priority.  *Id.* at 90:15–21.

12

personnel, including the fire district chiefs assigned to their respective divisions" and that "[e]ach of the fire district chiefs supervise at least nine other firefighters working in their respective districts" without analyzing whether they supervised each of these employees on a daily basis).

Additionally, on every job that Allen ran, he "exercised meaningful discretionary oversight" over the members of his crew. *See, e.g.*, *Carranza*, 2017 WL 387196, at \*4 (granting summary judgment on overtime claims where plaintiff directed the work of his crew and ran inspection jobs); *Aguirre*, 2007 WL 2900577, at \*24 (granting summary judgment on overtime claims where plaintiff directed work of subordinates by ensuring they complied with policies and protocols). As the Senior Operator, Allen was solely qualified to run the job in the field and directed the work of fourteen (14) subordinates throughout his employment. *See **Exhibit B***, at 15:19–25; 16:19–24; 163:5–11. Thus, Allen satisfies this element.

> **(c)** ***Allen's recommendations regarding the employment of his subordinates were given particular weight.***

Finally, Priority gave particular weight to Allen's recommendations for employment actions for his crew members. Courts consider factors such as "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105; *Gellhaus*, 769 F. Supp. 2d at 1082. An employee's recommendations can still have "particular weight," even if a more senior manager makes the final decision. *Gellhaus*, 769 F. Supp. 2d at 1082 (noting few employees would be exempt if the exemption were limited to final decision-makers).

There is no question here that Priority gave particular weight to Allen's recommendations. Allen testified he was able to make recommendations for hiring, and he did,

13

in fact, report issues relating to employees' poor performance and request removal and replacement of employees on his crew. ***Exhibit B***, at 144:23–25; 145:9–146:1; 184:13–25. Importantly, Priority followed his recommendations and replaced those employees with new ones on his crew. *Id.* Allen further testified that Priority based its knowledge of employees' performance and of whether an employee deserved to be fired on the recommendations of the Level 6 Senior Operator. *Id.* at 187:10–15. The evidence clearly demonstrates Allen gave his suggestions and recommendations to Priority, who afforded them particular weight.

Although Allen need only satisfy one element of the executive exemption for the highly compensated employee exemption to apply, in this case, Allen satisfies all three elements. Thus, the exemption undoubtedly removes Allen from the scope of the FLSA's overtime requirements. *See* 29. C.F.R. § 541.601(d); *see also Zannikos*, 605 Fed. App'x 349 at 359–60 (affirming the application of the highly compensated exemption for employee who primarily performed non-manual work directly related to the management or general business operations of the employer's customers); *Carranza*, 2017 WL 387196, at *5 (holding plaintiff was exempt as a highly compensated employee because he satisfied at least one of the duties of an executive employee); *Allen*, 846 F. Supp. 2d at 710–11 (same).

### 3. Allen Also Qualifies for the Administrative Exemption.

An employee who earns at least $455 per week on a salary basis[10] qualifies for the administrative exemption if: (a) he performs the primary duty of "office or non-manual work directly related to the management or general business operations of the employer or the

---

[10]    It is undisputed that Allen satisfies the salary requirement. *See **Exhibit B***, at 108:1–21; Part IV.B.1 *supra*.

14

employer's customers;" and (b) his "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

(a)     *Allen performed office or non-manual work directly related to the general business operations of Priority and its customers.*

Allen's position required him to perform non-manual work directly related to Priority's and its customers' general business operations.  Regulations distinguish between administrative work, which "relate[s] to assisting with the running or servicing of the business" from production work, such as "working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* § 541.201(a).  Such administrative work includes, but is not limited to: quality control, purchasing, procurement, safety and health, personnel management, human resources, employee benefits, and labor relations.  *Id.* § 541.201(b). Employees also perform exempt administrative work when they provide such work to an employer's customers, as Allen did here. *Id.* § 541.201(c) ("An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers.").

As an initial matter, the regulations specifically recognize that an employee—like Allen—"who leads a team of other employees assigned to complete major projects for the employer . . . generally meets the duties requirements for the administrative exemption." *Id.* § 541.203(c).  This is true even if the employee does not have supervisory authority over the other employees, which Allen here did.  *Id.* § 541.203(c).  Allen performed the precise role the regulation describes.  Indeed, Allen himself testified that as a Senior Operator he was the lead man, "push[ing] the people on the particular job site, making sure that everything goes the way . . . procedurally [that] it was given to [the lead man]."  ***Exhibit B*** at 182:2–5.

15

(i)    *Non-manual work was Allen's primary duty*

Non-manual management work was Allen's primary duty. Specifically, his duties involved participating in planning the work, testing extracted product, monitoring the testing process, directing the work of other crew members, communicating "numbers of reportings" to the client, and communicating with the customers and the Company. *Id.* at 26:5–11; 45:23–46:3; 46:15–24; 79:3–16; 163:5–11. Even if Allen performed occasional manual work alongside the crew he supervised, this would not disqualify him from the administrative exemption because such work was not his primary, most important duty. "The focus of the 'primary duty' inquiry . . . is on what the employee does that is of principal value to the employer, not on the collateral tasks that he may also perform even if the collateral manual tasks consume more than half his time." *Self v. Meritage Homes Corp.*, No. G–11–0070, 2014 WL 2171468, at *5 (S.D. Tex. May 23, 2014) (finding construction manager qualified for administrative exemption even though he performed some "collateral manual tasks" because such tasks were not his primary duty); *see also Pruitt*, 2012 WL 12874902, at *4. Allen himself characterized his job as leading the crew. ***Exhibit B*** at 182:2–5. Any manual work he performed was minor, incidental to his management responsibilities, and clearly not his most important job duty. *See **Exhibit C***, ¶ 5–6.

(ii)    *Allen's work directly related to Priority's and its clients' business operations*

At all times relevant to Allen's employment, his work directly related to Priority's general business operations. Allen's testimony demonstrates he was a key representative of Priority while on the job site. ***Exhibit B***, at 46:15–24; 79:3–16; 182:2–5. He testifies he was the lead man of the crew, responsible for interfacing with clients, providing accurate reports and acting as the boots on the ground at the worksite, and recommending further courses of action.

16

*Id.* at 46:15–18 ("[M]y biggest job is – is being the eyes and the ears . . . for the company man [and] for my field sup[ervisor] to have adequate numbers of reportings and all of that and stuff that they're receiving."); *id.* at 79:3–16 (acknowledging he plays an intermediary role between the company man and Priority—"that's pretty much me all the time"); *id.* at 182:1–5 ("The lead man, he basically pushes the . . . people on the particular job site, making sure that everything goes the way . . . procedurally it was given to him. . . .  I would call myself a lead man in that situation."). Allen was responsible for the selection and security of his crew and company equipment.  *Id.* at 59:1–14; 60:5–12; 163:5–11; 80:4–81:6.  In sum, Allen's job involved quality control of extracted product, customer relations, customer satisfaction, and personnel management dealing with his crew.  *See id.* at 26:5–11; 45:23–46:3; 46:15–24; 79:3–16; 163:5–11.  These duties undoubtedly related to Priority's general business operations.  *See, e.g.*, *Pruitt*, 2012 WL 12874902, at *4–7 (finding plaintiff's primary duty related to management or general business operations of defendant when he had the authority to select crews and equipment, discipline employees, give advice to owners on employees, conduct safety meetings, etc.); *see also Self*, 2014 WL 2171468, at *4 (finding construction manager job involving customer relations, customer satisfaction, and quality control qualified for the administrative exemption); *Monroe Firefighters Ass'n v. City of Monroe*, 600 F. Supp. 2d 790, 804 (W.D. La. 2009) (holding fire chiefs were administratively exempt in part because they had to ensure the safety and security at the fire stations under their command).

Moreover, there is no question that Allen performed work directly related to the general business operations of Priority's customers at that time—oil and gas drilling companies.  Allen's testimony demonstrates he was the face of Priority on site and acted as the intermediary between

17

Priority and the company man—Priority's customer. *See* **Exhibit B**, at 79:3–16; 211:7–10. Allen's work required him to perform various types of testing on extracted products, monitor the testing process, and perform troubleshooting on client wells to ensure the drilling process was safe and efficient. *Id.* at 26:5–11; **Exhibit C**, at 2–3. In doing so, Allen consulted with Priority's clients, advising them when certain courses of action were necessary. **Exhibit C**, at 2–3; **Exhibit B**, at 45:23–46:3 ("[W]hen you have a problem with the well, . . . you call the company man or the supervisor; and you let them know, hey, this is occurring . . . in my opinion, I think . . . we should try this. And they may say, okay, let me look at your report, and I'll call you back in a few minutes."); *see id.* at 26:5–11. Importantly, **the regulations provide that employees acting as consultants to an employer's clients may qualify as exempt**. *See* 29 C.F.R. § 541.201(c). Allen's testimony itself demonstrates he acted as a consultant to Priority's clients:

> A.   My biggest -- my -- my biggest job is -- is **being the eyes and the ears** . . .
> **for the company man** for my field [supervisor] to have adequate numbers
> of reportings and all of that and stuff that they're receiving.

**Exhibit B** at 46:15–24 (emphasis added). As Allen explained, the testing he performed was "important" to the job. *See id.* at 171:18–172:2. Thus, throughout the time of Allen's employment, his work was vital to both Priority's and its clients' business. *See, e.g.*, *Dewan v. M-I, L.L.C.,* No. H-15-1746, 2016 WL 695717, at *31 (S.D. Tex. Feb. 22, 2016) (finding employees working on oil and gas clients' sites exempt because they spent nearly all of their time continually monitoring the mud for quality control and acted as consultants to the clients).

> **(b)**   *Allen exercised discretion and independent judgment regarding matters of significance.*

There can be little doubt that—as the Senior Operator and highest-ranked operator in the field—Allen necessarily exercised discretion and independent judgment over matters of

significance, which "involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a).  Factors to consider include whether the employee carries out major assignments in conducting the operations of the business; whether the employee provides consultation or expert advice to management; and whether the employee is involved in planning long- or short-term business objectives.  *Id.* § 541.202(b).  Employees can exercise discretion and independent judgment even where they consult manuals and guidelines in the course of making decisions. *See, e.g.*, *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 586 (5th Cir. 2006).

Allen exercised discretion and independent judgment in running testing jobs on extracted product, monitoring the drilling process, and managing his crew.   Allen independently determined when client equipment or processes required troubleshooting and often conducted the troubleshooting without consulting a superior.  *See, e.g.*, **Exhibit B**, at 56:2–57:2.  Allen further exercised discretion and independent judgment with respect to matters of significance—quality control of the condition of the extracted product, which is a vital part of drilling—because Allen's duties included managing the separator systems and testing process, as well as managing the crew on these well testing jobs.  *See id.* at 26:5–11 (testifying that the separator tests the extracted product); *id.* at 163:5–11 (acknowledging that the senior-level operator directs other two employees); *id.* at 15:19–25 (testifying that, with respect to running the separator, "if you can sufficiently do that, then they will put you as a lead on a job"); *id.* at 16:4–9 ("You don't want a hand just . . . trying to . . . run the separator."); *id.* at 16:19–24 ("[A]s far as troubleshooting . . . they leave that up to me").  Allen's decisions regarding these jobs went to the core of Priority's and its clients' business, and were essential to its general business

19

operations.  *See Exhibit C*, ¶ 8.  As the lead man, Allen's determinations regarding the integrity of a client's extracted product were at the heart of the services Priority provided.  *Lott*, 203 F.3d at 332 (finding that plaintiff's work as an office manager required the exercise of discretion and independent judgment as they were directly related to the company's policies and business operations).  Accordingly, Allen satisfies the administrative exemption.

> **4.     In the Alternative, Allen Was Exempt from Overtime Due to the Nature of His Combined Exempt Duties.**

Even if the Court finds a triable issue of fact as to whether the executive or administrative exemptions apply, Allen nonetheless qualifies for the FLSA's "combination exemption," which applies when an employee's primary duties are a combination of duties for several exemptions. The regulations permit employers to "cobbl[e] together" exempt duties from separate exemptions to meet the primary duty test. 29 C.F.R. § 541.708 (2013); *King*, 11 F. Supp. 3d at 786. This exemption applies "'where (1) an employee performs more than one type of work that would be exempt except that (2) neither type of work alone can be termed the employee's primary duty, but (3) all of the putatively exempt work taken together constitutes the employee's primary duty.'" *Dewan*, 2016 WL 695717, at *13 (citing *Dalheim*, 918 F.2d at 123)). Thus, even if Allen's duties do not fully satisfy the administrative or executive exemptions, he is still exempt from overtime because, considered together, his duties qualify for the combination exemption.

## III.     CONCLUSION AND PRAYER

Priority properly classified Plaintiff Michael Allen as exempt from overtime.  In fact, his duties qualify him for at least *four* FLSA exemptions: (1) the highly-compensated employee; (2) the executive; (3) the administrative, and (4) the combination.  As a result, Allen's overtime claim fails as a matter of law and summary judgment should be granted in Defendant's favor.

DATED this the _____ day of _____, 2017.

Respectfully Submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Daniel D. Pipitone*           
    Daniel D. Pipitone
    Texas Bar No. 16024600
    700 Milam Street, Suite 2700
    Houston, Texas 77002
    Tel:  713-222-4060
    Fax:  713-222-5813
    dpipitone@munsch.com

**ATTORNEY IN CHARGE FOR DEFENDANTS**

**OF COUNSEL:**
**Munsch Hart Kopf & Harr**
700 Milam Street, Suite 2700
Houston, Texas 77002

## CERTIFICATE OF SERVICE

I hereby certify that on _____, 2017, a true and correct copy of the foregoing document was electronically filed with the Clerk for the Western District of Texas and served on all parties via CM/ECF system.

                              Daniel D. Pipitone

4843-0003-3351v.3