**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| **MICHEAL ALLEN and NATHAN SCOTT HARRIS,** | § § § | |
| **Plaintiffs,** | § | |
| v. | § § | **CIVIL ACTION NO. 7:16-CV-47-DAE** |
| **PRIORITY ENERGY SERVICES, LLC, PRIORITY WELL TESTING, LLC And K&B OILFIELD SERVICES, INC.** | § § § § | |
| **Defendants.** | § § | |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COME Micheal Allen and Nathan Scott Harris, Plaintiffs, and file this their Motion for Partial Summary Judgment, and would respectfully show as follows:

## NATURE AND STAGE OF THE PROCEEDING

1.    This case was filed on February 15, 2016 to recover overtime payments under the Fair Labor Standards Act.  The court's discovery deadline was March 30, 2017, and dispositive motions must be filed no later than May 1, 2017.

## ISSUES PRESENTED

2.    In Defendants' Answer to Plaintiffs' First Amended Original Complaint, Defendants ["Priority"] admit that Plaintiffs Allen and Harris were employed by Priority Well Testing, LLC.[1]  Defendants have asserted the affirmative defenses that Plaintiffs were properly classified as exempt employees under the Executive, Administrative and Highly Compensated

---

[1] Dkt. 10 at ¶11 & 12; throughout this motion, "Defendants" or "Priority" refers to Priority Energy Services, LLC and Priority Well Testing, LLC.

exemptions, as well as any other exemptions found to apply.[2]   Pursuant to Fed.R.Civ.P. 56(a)

this motion seeks summary judgment on these affirmative defenses.

## FACTS

3.      Allen and Harris were employed as level 6 senior operators.[3]  Allen worked from

May 21, 2013 to February 27, 2014.[4]  Harris worked from May 20, 2013 to August 22, 2013[5],

and Feb. 4, 2014 to Sept. 11, 2014.[6]  Their duties and responsibilities began by showing up to the

well site with the equipment necessary for frac support.[7]  Frac support entailed rigging up 700

feet of pipe and a manifold.[8]  The senior operator and another employee will run the pipe, called

"hammering it up," from the well tree to tanks and a pit in a process that takes about 10 hours.[9]

Once the equipment is rigged in, the process of frac support begins and usually lasts between 7

and 14 days.[10]  At the conclusion of the frac support, the equipment has to be rigged-in for drill-

out which involves reconfiguring the pipe and installing sand trap valves.[11]  Drill-out involves

the process of running coil tubing down the well and drilling out the plugs that were placed in the

well at various depths during fracing.  The job of the senior operators during the drill-out process

is to control the flow of the well because if the well plugs up it could send back pressure to the

wellhead.[12]

---

[2] *Id.* at 6, Tenth Defense. Alex Duplechin testified as the Defendants' Rule 30(b)(6) witness that he was not aware of any other exemptions that the Defendants are asserting. Duplechin dep. at 83:14-23. Defendants' attorney stipulated at the deposition that Mr. Duplechin was the Defendants' designated corporate representative on the topic of the legal and factual basis regarding any claimed exemptions under the FLSA, and any affirmative defenses. *Id.* at 13:19-14:3; 14:19-15:17 and Ex. 1 to the deposition, topics 4 and 5.
[3] Allen dep. 90:17-21; Harris dep. 60:18-61:11.
[4] Allen dep. 91:9-92:7.
[5] Harris dep. 60:18-62:6.
[6] Harris dep. 149:2-9.
[7] Allen dep. 155:3-17; Exhibits E&F, Plaintiffs' declarations, generally describe their duties from the beginning to the end of the process.
[8] *Id.* at 155:20-156:22.
[9] *Id.* at 157:1-24.
[10] *Id.* at 159:13-160:1.
[11] *Id.*
[12] *Id.* at 165:21-166:25.

4.      Once the drill-out is complete, the operators then rig-in for flow-back which entails bringing out a separator, the flare stack, and rerouting the pipe.[13] Because the well was packed with sand as part of the fracing procedure, flow back is the process of trying to clean the well bore by removing the loose sand in a procedure that can take anywhere from 5 days to 5 months.[14] The liquid coming from the well, which consists of water, oil and gas, is sent through a separator which separates these three components.[15] Following flow-back the well is turned into a production well and is monitored by the senior operator using the well owner's equipment.[16] At this point in the process, he gets about 4 hours of uninterrupted sleep per day and works the other 20 hours to make sure that the tanks (which hold 400 barrels) are emptied regularly by a truck that he calls out to the well site.[17] The operator "straps" the tanks at regular intervals until he has spent about 6 hours straight "strapping" them to determine how much oil is being pumped into the tanks so he will know when to call the truck drivers out to empty the tanks and allow him to catch his 4 hours of sleep.[18] This work during the production phase can last between 2 weeks and 90 days.[19] Allen remembers working one stretch of 24 hours a day, 7 days a week, for 33 days consecutively,[20] while Harris remembers working such a schedule for 2 or 3 weeks at a time.[21] During these stretches the operator takes catnaps.[22]

---

[13] *Id.* at 165:8-20
[14] *Id.* at 170:23-171:11.
[15] *Id.* at 171:13-172:15.
[16] *Id.* at 173:2-20.
[17] *Id.* at 173:21-177:5.
[18] *Id.*; "Strapping" the tank involved climbing up the side of the tank and using a stick gauge to measure barrels per minute of flow.  Allen declaration at ¶7.
[19] *Id.* at 174:5-12.
[20] *Id.* at 175:3-13.
[21] Harris dep. at 110:8-20.
[22] *Id.* at 109:20-24.

## SUMMARY JUDGMENT STANDARD

5.     Summary judgment may be granted if the record, taken as a whole, together with competent evidence, shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.[23]  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[24]  In making the determination that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, the court must view the evidence in the light most favorable to the opposing party.[25]  A dispute is only "genuine" if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party."[26]  A dispute is only "material" when its resolution "might affect the outcome of the suit under the governing law."[27]  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[28]

6.     Priority cannot defeat Plaintiffs' motion by resting on mere allegations in its pleadings; rather, it must establish specific facts showing that there is a genuine issue for trial.[29]  This burden is not satisfied with some metaphysical doubt as to the material facts or by a scintilla of evidence.[30]  Priority, likewise, cannot satisfy its summary judgment burden with conclusory allegations, speculation or unsubstantiated assertions.[31]  Ultimately, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who

---

[23] *Celotex v. Catrett*, 477 U.S. 317, 325 (1986).
[24] *Id.* at 323-24.
[25] *Tolan v. Cotton*, 572 U.S. ___, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014).
[26] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[27] *Id.*
[28] *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citations omitted).
[29] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[30] *Id.*
[31] *Douglass v. United States Auto Ass'n*, 65 F.3d 452, 459 (5th Cir. 1995), reversed on other grounds, 79 F.3d 1415 (5th Cir. 1996) (en banc).

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[32]

## EVIDENCE

7.      The following exhibits are incorporated into this motion:

EXHIBIT A - Excerpts of Plaintiff Micheal Allen's deposition transcript;

EXHIBIT B - Excerpts of Plaintiff Nathan Harris' deposition transcript;

EXHIBIT C - Excerpts of the 30(b)(6) deposition of Alex Duplechin;

EXHIBIT D – Well test field tickets from May 20, 2013 through September 10, 2014;[33]

EXHIBIT E – Declaration of Micheal Allen; and

EXHIBIT F – Declaration of Nathan Scott Harris.

## ARGUMENT AND AUTHORITIES

8.      The Fair Labor Standards Act provides that employees who work more than 40 hours per week must be compensated for their overtime.  29 U.S.C. §216(b).  Employees who occupy an administrative position do not need to be paid overtime.  29 U.S.C. §213 (a)(1).  Like the other exemptions contained in the Act, the administrative exemption is "construed narrowly against the employer seeking to assert" it, and the employer bears the burden of proving that employees are exempt.[34]  As the Fifth Circuit has explained, "the ultimate decision whether the employee is exempt from the FLSA's overtime compensation provisions is a question of law," though the decision whether an employee is exempt from the FLSA's overtime compensation provisions under 29 U.S.C. §213(a)(1) is primarily a question of fact.[35]

---

[32] *Little*, 37 F.3d at 1075 (quoting *Celotex*, 477 U.S. at 322).
[33] Filed under seal.
[34] *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224 (5th Cir. 1990) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 1960)).
[35] *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 330-31 (5th Cir. 2000) (*citations omitted*); "A job title alone is insufficient to establish the exempt status of an employee.  The exempt or nonexempt status of any

9.    Because Priority has asserted the applicability of three exemptions in its Answer to the First Amended Original Complaint, each will be addressed.[36]

**a.    Administrative exemption**

10.    An "employee employed in a bona fide administrative capacity" in §13(a)(1) of the Act is any employee:

> (1)    compensated on a salary or fee basis at a rate of not less than $455 per week...[37]
>
> (2)    whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3)    whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. §541.200(a).

**1.    Office or non-manual work directly related to management or general business operations.**

11.    The second prong of the administrative exemption requires an employee to primarily perform office work "directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. §541.200(a)(2).   The regulations[38] explain that a qualifying employee "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."[39]

---

particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations..."  29 C.F.R. §541.2.

[36] Dkt. 10 at 6, Tenth Defense; *supra n.2.*

[37] Plaintiffs do not dispute that they were compensated on a salary basis of not less than $455 per week, but maintain that their work does not meet the second and third prongs of the test.

[38] *Id.* at §541.201(a).

[39] The regulations provide that:  "(b) work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel

12.    An employee's primary duty[40] is the principal, main, major or most important duty that the employee performs based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.[41] An employee's primary duty must be the performance of exempt work.[42]

13.    Under questioning by Priority's attorney, Harris and Allen described their primary duties.

**i. Harris**

Q.    Okay.  So that's during the frac.  So I guess continue taking me through the process.  What happens when the frac is complete?

A.    So you get done with the frac.  As soon as the frac is done, you bring in a test separator flare, your test equipment, move tanks around location, rerig all your stuff.  So if you finish the frac at 2 o'clock in the morning, you're going to work your butt off to get all that done.

So you start flowing the—flowing to a tank.  If you've got enough gas to go through your separator, you turn it through your separator.  If you don't, you flow it to the tank until you do get enough gas.

And once you start doing that, you—I mean, you're sitting there on top of it making sure that you're not overrunning tanks, that you're getting water pulled out, that you're selling the oil if you're making oil, that your flare is still working right, that your vessel isn't flooding.  There's a lot of things that go on.

Q.    So is this—is this the crux of the job, this is the well test stuff that you're doing right here at this stage?

A.    To attempt—to an extent, yes.

---

management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.  Some of these activities may be performed by employees who also would qualify for another exemption."  29 C.F.R. §541.201(b).

[40] 29 C.F.R. §541.700(a).

[41] *Id.:*  "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."

[42] *Id.*

Q.      And I understand that there is these other duties that you do that go along with being a well test operator.

A.      Uh-huh.

Q.      Where you are monitoring the frac, you're doing rigging up, you're doing rigging down.   But this period of time here where you're doing all this monitoring, you're running the separator, you're making sure that everything is working correctly, this is really the stuff where all that knowledge and experience is really coming in, right?

A.      Yes.

Q.      Okay.  And is this what you would describe as the primary duty of a well test operator?

A.      Of a well tester, yes.

Q.      Okay.   And you qualified your answers of a well tester.   So is there something about a well test operator that's different from a well tester?

A.      No.  You've got a flowback operator, and you've got a well test operator.

Q.      And so when you're working as a well test operator, this process that you just described to me with all the monitoring and all the making sure that things are going correctly, this is the primary function of a well test operator?

A.      Yes.  Production.

Q.      Okay.  Sorry?

A.      Production.

Q.      Production?

A.      Yeah.

Q.      Okay.  And so while there may be a lot of manual labor going into it and coming out of it, a lot of what you're doing at this stage is kind of sitting on the well, making sure—and maybe I'm saying that incorrectly—but monitoring the well and making sure everything is going okay while maybe, at times, having to get up and run and go fix a few things.  But usually, typically, you're sitting in a chair monitoring computers.  Is that accurate?

A.      No.

Q.      Okay.  Explain to me how that's incorrect.

8

A.      You are sitting outside in front of a separator –

Q.      Okay.

A.      -- watching it.

Q.      So I guess, like, when I said computer, I should have said separator?

A.      Yep.

Q.      You're sitting monitoring a separator?

A.      Yeah.  But you've still got to go gauge tanks every hour, you've still got to dump sand every 10 or 15 minutes, depending on how much you're making, still –

Q.      Can I get you to slow down just –

A.      Yeah.

Q.      So you've got to – every 10 to 15 minutes, you're dumping sand?

A.      That's if you're making that much.  It varies.  Sometimes it's 30 minutes. Sometimes it's an hour.  It just depends on what the well is doing.

Q.      Give me an example of a time that you had to go dump sand every 10 to 15 minutes.  What kind of job was it?  What were the circumstances?

A.      Usually on a fresh open, you do.

Q.      And how often are you dealing with a fresh open?

A.      Ninety-five percent of the time.

Q.      Okay.  So your testimony today is that 95 percent of the time while you're working as a well test operator, you're getting up every 10 to 15 minutes to dump sand?

A.      On the start of the job.

Q.      On the start of the job?  On the start of this phase of the job?

A.      Yes.

Q.      Okay.  And how long does that last where you're dumping sand every 10 to 15 minutes?

A.      It can last anywhere from a day to 20 days.[43]

Harris dep. 87:11-91:13.

**ii. Allen**

Q.      Okay.  So now in the flow-back process, tell me what you – I understand that y'all do the – the rig up process to get ready for flow-back.  Tell me what you're doing during flow-back, which can last anywhere from five days to five months, you said?

A.      During – during – during flow-back, we're actually – this is where – we're trying to clean the well up.  And what I mean by clean the well up, of course we have all that sand in there.  The sand is put down there to pack the purse, to open them up.  So all that loose sand, we want to try and get that out.  You know, get that out.  So that way – and it takes – we want to get all of that water out of there, you know, so that the well can start gassing because the gas and the oil is – is what – what makes the money.

Q.      Uh-huh.

A.      So we flow, flow, flow, flow, flow until we start seeing -- we may start seeing gas.  If I start seeing gas, I know oil -- oil is not too far behind.

Q.      And this is where the -- the money is made and the important stuff is happening and –

A.      Yeah.  This is where -- this is where the -- this is where the important things start to happen at.  So I'll send it through the separator.  So now it can start -- because now there's an oil sheen on the water.  You don't know that it's really oil unless -- until the separator separates it.  So now you got your water.  You got your oil.  And I'm burning off the gas.  Now, I'm burning off the gas, and that's going to be a temporary thing until this facility is built because I'm going to send it down a pipeline here shortly when they get the facility made up.

Q.      Okay.

A. And so we start to –

Q. So this is the period of time that you're -- what we were talking about earlier, you're running the separator.  You're doing troubleshooting, if need be?

---

[43] See also Harris declaration.

A. Yes.

Q. So this is like kind of the crux of your job, then?

A. Yes.

Q. What it all boils down to?

A. Yes.

Q. Okay. So if we wanted to talk about your job in terms of your primary duty, we should talk about this aspect of it?

A. Yes.[44]

Allen 171:13-172:15.

14.     As described by the Plaintiffs, the primary duty of a senior operator for Priority Well Testing involves rigorous, heavy physical labor at the well site, not in an office.  On this fact alone, senior operators like the Plaintiffs cannot satisfy the second prong of the administrative exemption.  Additionally, in order "[t]o qualify for the administrative exemption, 'an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.'"[45]  "The distinction between production and administrative tasks is not dispositive, but is still part of the administrative exemption analysis."[46]  "While perhaps a bit archaic, this dichotomy attempts to distinguish 'between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market.'"[47]  Here, the plaintiffs helped in the overall process

---

[44] See also Allen declaration.

[45] *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 Fed. Appx. 349, 353 (5th Cir. 2015).

[46] *Elliott v. Dril-Quip, Inc.*, 2015 WL 7302764 at *8 (S.D. Tex.  November 18, 2015) (*citations omitted*).

[47] *Clark v. Centene Co. of Texas, L.P.*, 44 F.Supp.3d 674, 682 (W.D. Tex. 2014) (quoting *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990)).

of producing oil and gas by erecting and operating equipment at the well site of Priority's customers, and connecting the equipment to piping that carried the product to holding tanks. Production of the oil and gas was the direct result of their work with frac support, drill-outs, and flow-back.   "[I]f a court determines that an employee generates, or 'produces' the product/service that the employer offers to the public, then that employee is a 'production' employee who cannot qualify for the administrative exemption."[48]  Because Harris and Allen did not perform work directly related to assisting with the running or servicing of the business, but generated the oil and gas that was being offered to the public, they are considered production employees under this analysis, and cannot qualify for the administrative exemption.

      **2.**      **Exercise of discretion and independent judgment with respect to matters of significance**

      15.      In order to satisfy the third prong of the administrative exemption, the employee must exercise discretion and independent judgment with respect to matters of significance.

      (a)      To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance.  In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.  The term "matters of significance" refers to the level of importance or consequence of the work performed.
29 C.F.R. §541.202(a).

      (b)      …Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from

---

[48] *Lutz v. Huntington Bancshares, Inc.*, 2014 WL 2890170 at *8 (S.D. Ohio June 25, 2014) (citations omitted).

established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long-or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances. 29 C.F.R. §541.202(b).

16.      These senior operators applied well-established techniques and procedures in a largely repetitive manner every day.[49]  Gauging (strapping) tanks and dumping sand every 10 to 15 minutes, and closely monitoring the separator does not involve judgment and discretion; it involves repetitive tasks that are carried out in a routine manner in accordance with the parameters set by Priority.  Rigging pipe up and down and reconfiguring the pipe among tanks was recurrent and routine work for these operators.  These operators did not have the discretion to alter the procedures[50] they were required to follow, and anytime there was a problem with the equipment the operator was expected to contact the company man and the field supervisor who had the final say in how to address the problem.

> Q.      And we'll talk about that in just a second, but it just occurred to me, as a senior-level operator, you're the one troubleshooting, right?
>
> A.      Yeah. You're troubleshooting.
>
> Q.      Okay. And so whenever there's a problem out on the job site, an issue comes up and -- and something needs to be fixed or figured out, the senior operator is the first person who – who has to kind of go through the process of figuring it out, right?
>
> A.      Yeah. As far as -- as far as the equipment is concerned, yes.
>
> Q.      Are there other issues that come up on the job site that are not the senior-level operator's duty to fix or figure out?
>
> A.      Well, no. When -- when you have a problem with the well, you have to call -- you call the company man or the supervisor; and you let them know, hey,

---

[49] 29 C.F.R. 541 202(e).
[50] Any deviation from normal procedure had to be reported.  Allen dep. 56:2-57:12.

this is occurring or -- and I think that this should -- in my opinion, I think that this -- we should try this. And they may say, okay, let me look at your report, and I'll call you back in a few minutes. And I'll use this for an example. On the manifold, there's a thing called a choke. The choke is used to determine flow of the well. Well, by procedure, the company man may tell me, okay, 9:00 o'clock a.m., I want it on a 16 choke. At 11:00 o'clock, you need to bring it up to an 18 choke. And that's on the procedure of the paper. Well, I bring it up to an 18 choke, and a lot of sand starts coming up out of the well instead of fluid. Well, I have to call them and say, hey, look, this is what I got. And they're going to make a decision. They're going to say, keep it right there and see what it does or, hey, let's go ahead and bring it back down a choke size. My biggest -- my -- my biggest job is -- is being the eyes and the ears or -- or -- or what have you for the company man for my field sup to have adequate numbers of reportings and all of that and stuff that they're receiving.

Q.      Okay. And so when you say eyes and ears, it's kind of the same as -- as what we were talking about earlier. You're the boots on the ground. You're the person who's there –

A.      Yes.

Q.      -- and has the stuff in front of you?

A.      Yeah.
Q.      And so when you call and report back to the -- to the manager, to the company man, you say, look, this is what's happening. This is what I think we should do, based on what I'm seeing. And then the manager or company man may or may not take your advice?

MR. SULLIVAN:      Object to the form of the question.

Q.      (BY MS. HILL) Do you understand the question?

A.      Yeah. I understand. I understand. They may or may not take my advice? They, in actuality -- they will come out there. They're going to come out and -- and -- and see. They're going to put the numbers. And, yes, it would be up to them to -- to -- to do whatever they want to do, because I'm just giving my opinion, you know.

Allen 45:10-47:12.

If the problem affected the well's output, even for a short time, the operator was required to note the problem in his report to the field supervisor or company man.[51]  Routine issues were

---

[51] *Id.*

usually handled without consulting the company man or field supervisor in advance.[52] Maintenance work could be done without having to call the supervisor.[53]

The only time the operator has the discretion to act on his own is when somebody is about to get hurt. In that situation, the operator and anyone on the job site have stop-work authority and can shut the well in to prevent an injury.[54]  Otherwise, during the flow-back process, the senior operator is running the separator, extracting all the water and loose sand out of the well, and letting the well flow until the separator can begin to separate the oil, gas and water during a process lasting between five days to five months.[55]  He is reporting well-head pressure, time, date, and how much oil, gas and water flowed.[56]  The operator is using his skill and experience in applying well-established techniques or procedures to ensure that the flow-back process runs smoothly.

In *Zannikos*, 605 Fed. Appx. at 355-58, the court considered the ten factors set forth above in 29 C.F.R. §541.202(b) and concluded that the work performed by marine superintendents did not extend beyond the application of skill in applying specified standards. Applying the ten factors to the work performed by Harris and Allen yields the same result.[57]

Senior operators did not formulate, affect, interpret, or implement management policies or operating practices at the well site.  They did not carry out major assignments in conducting the operations of the business.  They do not perform work affecting business operations to a substantial degree nor do they have the authority to commit the employer in matters that have significant financial impact.  They could not waive or deviate from established policies and

---

[52] Harris dep. 84:5-19.
[53] *Id.* at 84:20-85:3.
[54] Allen dep. 49:4-50:17.
[55] Allen dep. 170:23-172:15.
[56] Allen dep. 218:13-22.
[57] See generally, the declaration of Harris and Allen.

procedures without prior approval, unless it involved stop-work authority for safety reasons. They could not negotiate or bind the company on significant matters. With regard to whether they provided consultation or expert advice to management, Allen was quite clear that they defer to the company man because of the risks involved.[58] They do not plan long or short-term business objectives nor do they investigate and resolve matters of significance on behalf of management. Finally, they do not handle complaints, arbitrate disputes, or resolve grievances. In short, senior operators like Allen and Harris could not exercise the discretion and independent judgment necessary to meet the third element of the administrative exemption.

**b.     Executive exemption**

The second exemption relied upon by Priority is the executive exemption. To qualify for the executive employee exemption, the employer has the burden of proving all of the following criteria: (1) that the employee is compensated on a salary basis at a rate of not less than $455 per week; (2) that the employee's primary duty is managing the enterprise or, alternatively, managing a customarily recognized department or subdivision of the enterprise; (3) that the employee customarily and regularly directs the work of at least two or more other employees; and (4) that the employee has the authority to hire or fire other employees, or whose suggestions and recommendations as to hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. §541.100. The first prong is not in dispute.

**1.     Managing the enterprise.[59]**

---

[58] Allen dep. 169:8-170:22.
[59] Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work;

Whether one characterizes the primary duty of a senior operator as flowback[60] or production,[61] neither Allen nor Harris managed the enterprise or a department or subdivision of the enterprise. The manager of the flow back department was Craig Struck when Harris first began working at Priority because the field supervisor position had not been filled.[62] Once Priority hired a field supervisor, Danny Harris, he took care of everything.[63] The general managers and field supervisors handle the day-to-day operations of the business, while the senior operator is the "boots on the ground,"[64] "a grunt like everybody else."[65] According to Allen, the supervisor and company man were the people who called the shots.[66] Neither Allen nor Harris performed any of the other "management" activities identified in 29 C.F.R. 541.102.[67]

**2.      "Customarily and regularly directs the work" of at least two other employees.**

According to Priority's 30(b)(6) witness, the signed, approved field ticket is what's finally invoiced to the customer. The field ticket is the originator of all the information about what's happening at the well.[68] In his words, the field ticket is "the Bible."[69]

---

determining the techniques to be used; apportioning the work among employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures. 29 C.F.R. 541.102.

[60] Allen dep. 171:3-172:15.

[61] Harris dep. 88:8-89:16.

[62] Harris dep. 55:16-56:10.

[63] Harris dep. 58:11-59:1.

[64] Allen dep. 36:6-37:9.  Priority's attorney engaged in lengthy and repetitive questions regarding the ability of the senior operator to direct the work of lower-level operators.  Harris testified that a senior operator could direct the work of the junior operator "to an extent," but if they didn't want to do it they didn't have to do it because the relationship between the senior operator and the junior operator was not that of a boss and an underling -- they were coworkers. Harris dep. 25:18-27:10; 96:13-98:23.

[65] Harris dep. 182:20-25.

[66] Allen dep.167:21-169:7.

[67] Declaration of Allen; Declaration of Harris.

[68] Duplechin dep. 91:20-92:13; 96:16-97:11.

[69] *Id.* at 96:22.

The third requirement for the executive exemption is that the employee "customarily and regularly direct the work" of at least two other employees.[70]   Exhibit 12 to Duplechin's deposition is comprised of Priority's well test field tickets in date order beginning on May 20, 2013 with number 14901 and ending on November 4, 2014 with field ticket number 32223.[71] These field tickets (342 in total) were used by Priority internally for determining what was going on at the well and to collect the money that the customer owed.[72]   Using field ticket number 14901 as an example, it shows that on May 20, 2013 the well test crew was comprised of the lead operator, Nathan Harris, and technical support, Danny Harris.[73]   Field tickets numbered 14902-04 reflect the same information.  Beginning with field ticket number 14905 Nathan Harris is working with Mike Allen performing coil washout. The next day, they "stand by for frac," (field ticket #14906), and perform flow back operations the following two days (field tickets #14907-08). They continue working at the well site through June 10, 2013 (ticket #14922).

Some of the field tickets in Duplechin Exhibit 12 (#25234, more easily identified by the bates #000266) reflect a larger crew, while some reflect a one-man crew (#21682 dated December 19, 2013, bates #000386).  Obviously, neither Harris nor Allen could direct the work of at least two other employees if they were on the well site alone or with one other employee. Thirty-three of the field tickets confirm that Harris was working with two or more other crew members; thirty-seven of the field tickets confirm that Allen was working with two or more other crew members. Consequently, for two hundred and fifty-one out of the three hundred twenty-one days of work documented in the field tickets it would not have been possible for Harris or Allen

---

[70] *Carranza v. Red River Oilfield Services, LLC*, 2017 WL 387196, at *4 (S.D. Tex. January 27, 2017).
[71] Duplechin dep. 94:14-23.  Only 321 of the field tickets are relevant – the last 21 pages of exhibit 12, bates #000587-607, post-date Harris' employment.
[72] *Id.* at 94:24-95:3.
[73] *Id.* at 101:10-14; 109:18-110:6.  Duplechin confirmed that the names of the crew on the field ticket are the names of the people who were on the well that day.

to direct the work of another crew member.  Although Harris and Allen each maintain that they did not direct the work of subordinates on the well sites, the field tickets are the best evidence establishing that they could not customarily and regularly direct the work of at least two other crew members.

3.       **Hiring and firing authority**

  The last requirement for application of the executive exemption is that the employee has hiring and firing authority, or whose suggestions and recommendations about promotion, termination, and hiring are given particular weight.[74]   Allen testified that he could not fire anyone, recommend someone for termination, or recommend someone for hire.[75]   Harris did not have the power to fire someone because he was not a supervisor.[76]   He had recommended three different people for a job at Priority with mixed results,[77] but these suggestions and recommendations are not relevant because they did not pertain to employees that Harris customarily and regularly directs. 29 C.F.R. §541.105.  His dad, Danny Harris, was hired as a level 6 senior operator but was promoted to Field Supervisor.[78]  There is no evidence that his recommendations for hiring someone were given particular weight.

c.       **Highly-Compensated Employee Exemption**

  The FLSA provides that an employee with total annual compensation of at least $100,000 is deemed exempt if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive or administrative employee. 29 C.F.R. §541.601(a).[79]  Defendants have asserted the highly compensated employee [HCE] exemption as

---

[74] *Chambers v. Sodexo*, 510 Fed. Appx. 336, 339 (5th Cir. 2013); 29 C.F.R. §541.100.
[75] Allen dep. 144:8-145:19; 181:9-182:10; 184:6-185:14.
[76] Harris dep. 96:17-23; 176:11-177:16; 181:19-182:25.
[77] *Id.* at 34:9-36:12
[78] Harris dep. 58:11-59:1.
[79] *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 Fed. Appx. 349, 359 (5th Cir. March 27, 2015).

one of their affirmative defenses.  Plaintiffs move for summary judgment on this exemption because a)  Harris and Allen did not customarily and regularly perform any of the exempt duties or responsibilities of an executive or administrative employee as demonstrated above; and b) the HCE exemption does not apply to individuals, like plaintiffs, whose primary duty involves physical labor.[80]

As reflected in the well test field tickets, Plaintiffs' primary duty involved rigging up and rigging down the well for fracing, coil washouts, flow back, coil tubing drill outs, well testing, and well monitoring.  All of these activities were physical, manual labor.[81]  While well testing and well monitoring may seem to be activities that are not physical in nature, obtaining pressure and temperature readings and monitoring the amount of oil, gas and water going to the tanks involves a great deal of physical labor because each operator has to climb tanks to obtain the readings from the gauges.[82]

### CONCLUSION

For the reasons set forth in this motion, Plaintiffs respectfully pray that the court grant summary judgment on the affirmative defenses of the Executive, Administrative and Highly Compensated Employee exemptions.

---

[80] Declaration of Allen; Declaration of Harris.  See also the FACTS, supra. at 2; "This section applies only to employees whose primary duty includes performing office or non-manual work.  Thus, for example, non-management production-line workers and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, laborers and other employees who perform work involving repetitive operations with their hands, physical skill and energy are not exempt under this section no matter how highly paid they might be." 29 C.F.R. §541.601(d).
[81] Declaration of Nathan Harris; declaration of Micheal Allen.
[82] *Id.*

Respectfully submitted,

THE LAW OFFICES OF FILTEAU & SULLIVAN, LTD.,
LLP


/s/Robert J. Filteau
Robert J. Filteau
State Bar No. 06997300
rfilteau@fso-lawprac.com
John A. Sullivan III
State Bar No. 19483500
jsullivan@fso-lawprac.com
9894 Bissonnet Street, Suite 865
Houston, Texas 77036
(713) 236-1400 Telephone
(713) 236-1706 Telecopier

**ATTORNEYS FOR PLAINTIFFS**


**CERTIFICATE OF SERVICE**

I hereby certify that on May 1st , 2017, a true and correct copy of foregoing instrument was electronically filed with the Clerk for the Western District of Texas and served on all parties via CM/ECF system, electronic mail and/or facsimile.

Daniel Pipitone
Michael A. Harvey
Brenna Hill
Munsch Hardt Kopf & Harr, P.C.
700 Milam Street, Suite 2700
Houston, Texas 77002

/s/Robert J. Filteau
Robert J. Filteau