IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| MICHEAL ALLEN and NATHAN SCOTT HARRIS | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | No. 7:16-cv-47-DAE |
| PRIORITY ENERGY SERVICES, LLC and PRIORITY WELL TESTING, LLC | § § § § | JURY DEMANDED |
| Defendants. | § | |

## PLAINTIFF NATHAN SCOTT HARRIS' MOTION TO STRIKE

NOW COMES Nathan Scott Harris, Plaintiff, and moves to strike portions of the Declaration of Alex Duplechin, and would respectfully show as follows:

1. The Declaration of Alex Duplechin was filed in support of Priority Well Testing, LLC's Motion for Summary Judgment. It is Exhibit "C" to the motion, Dkt. 43-3. In order to facilitate the court's review of the objectionable positions of the declaration, those portions are highlighted in yellow on the declaration attached as Ex. "A" to this motion.

2. A declaration used to support a motion for summary judgment must be made a personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). A court must not consider parts of a declaration that do not meet the requirements of Fed.R.Civ.P. 56(c)(4) when determining a motion for summary judgment. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir.2004).

3. Alex Duplechin testified on behalf of Priority Well Testing, LLC as its designated Fed.R.Civ.P. 30(b)(6) corporate representative with regard to 15 primary topics and numerous

subtopics, including the legal and factual basis regarding any claimed exemption to Plaintiff's overtime pay by Defendants (topic no. 4), the legal and factual basis underlying the Defendants' defenses and affirmative defenses (topic no. 5), and the job requirements of Plaintiff's employment, including his job duties and responsibilities (topic no. 13). Duplechin dep.[1] 14:9-15:21 and Ex. "1" to his deposition. Because Duplechin does not have personal knowledge of some of the matters addressed in his declaration, those portions of his declaration must be stricken.

4. PARAGRAPH 2. In paragraph 2, Duplechin states that "Priority organized its Well Testing Division employees into independent 'crews,' each led by a senior operator. Crews performed well testing services at the clients' worksites. Each crew in Priority's well testing division operated separately and independently from other crews. Priority considered each of its crews to be a permanent unit of the Company." First, the crews in the well testing division did not operate separately and independently from other crews. Each crew would gain or lose employees as the work at the well site dictated. Harris dep.[2] at 109:10-22; 111:9-16. Second, the vast majority of the "crews" consisted of one or two individuals, Dkt. 44-4 thru 44-8 (Well test field tickets), and as reflected in the well test field tickets, these individuals were seldom the same. Third, Priority Well Testing did not consider each of the crews to be a permanent unit of the company. Priority's documents reflect that each of its core businesses is a business unit, with well testing comprising one of those units. Ex. 3 to Harris dep. The well testing business unit is then divided by district, not by crews. Priority 1619 & 4323, attached as Ex. D. Finally, the entire highlighted portion of paragraph 2 is also infirm because it recites conclusory statements unsupported by any evidence other than Duplechin's word. Conclusory statements unsupported

---

[1] Excerpts from Mr. Duplechin's deposition are attached as Ex. B.
[2] Excerpts from Mr. Harris' deposition are attached as Ex. C.

by evidence of record are insufficient to avoid summary judgment. *Cooper-Schut*, 361 F.3d at 429; see also *TIG Ins. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir.2002) (conclusory allegations, speculation, unsubstantiated assertions, and legalistic argumentation are no substitute for specific facts showing genuine dispute of material fact).

5. PARAGRAPH 3. The statement "Priority's services were typically provided by crews consisting of two or more individuals, generally a Senior Operator and one or more hands/lower-ranked operators." This unsupported, conclusory statement is directly contradicted by the well test field tickets and the sworn deposition testimony. Dkt. 44-4 through 44-8; Harris dep. 73:18-74:1. "The hands/lower-ranked operators worked at the direction of the senior operators." This statement should be stricken because Priority Well Testing's job descriptions for level 1 to 5 employees reflect that none of them report to, are directed by or are supervised by a level 6 operator. Level 1 field helpers report to the operations manager or the field and shop supervisor. Priority Ex. E at 1699-1701. Level 2 field helpers report to the operations manager and to the field and shop supervisor. Ex. E at Priority 1702-04. Level 3 junior operators report to the well testing operations manager and vice president. Ex. E at Priority 1705-08. Level 4 operators and level 5 lead operators report to the well testing operations manager and vice president. Ex. E at Priority 1709-16; See also Harris dep. at 171:1-22.

6. PARAGRAPH 4. "... Supervising and directing the work of lower-level operators." This portion of paragraph four should be stricken from Duplechin's declaration for the same reasons set forth in the preceding paragraph. Also see Harris dep. at 96:13-98:23.

7. PARAGRAPH 5. In paragraph 5, Duplechin describes the duties of Mr. Harris in detail, including his "supervising" and "management" duties. But Duplechin is not competent to testify about Harris' day-to-day duties and responsibilities because as the vice president of

finance for a separate entity, Duplechin dep. at 32:9-15, he lacked the personal knowledge of field operations as demonstrated by his testimony:

> Q. Did PWT have any type of policy with regards to who received a company vehicle and who didn't?
>
> A. I'm not familiar with the specifics. We did have company vehicles that were used for certain senior operator types and those were usually assigned.
>
> Q. So who would be the best person to talk to about that? Would that be Russell Bird?
>
> A. Russell Bird.
>
> Q. And Exhibit 6 reflects that Harris was hired on May 26th, 2013, true?
>
> A. That's what it looks like, yes.
>
> Q. Both Harris and Allen were hired as Level 6 senior operators?
>
> A. Correct.
>
> Q. And back in 2013 at PWT, was there a Level 5 and a Level 7 well test employee?
>
> A. I don't believe there was a Level 7 at the time.
>
> Q. But there was a Level 5?
>
> A. I believe so.
>
> Q. And what was the title of a Level 5?
>
> A. I don't know specifically what it was.
>
> Q. If the documents reflect that it was a lead operator, does that sound correct to you?
>
> A. Possibly.
>
> Q. Do you know whether PWT had written job descriptions for Level 5 employees in 2013?
>
> A. I believe so.

Q. In 2013 at PWT, what was the title of a Level 1 employee?

A. I'm not familiar.

Q. Could it be shop hand?

A. I believe the shop was separate from the field, although there was a possibility of shop hands to go into the field.

Q. Who would be the best person to answer that?

A. Russell Bird.

Q. And in 2013 at PWT, what was the title of a Level 2 well test employee?

A. I'm not sure.

Q. Could it be operator trainee?

A. Possibly.

MR. HARVEY: Objection. Relevance.

Q. Would Russell Bird be the person to best answer that question?

A. Yes.

Q. In 2013 at PWT, what was the title of a Level 3 well test employee?

MR. HARVEY: Same objection. Relevance. You can answer.

A. I'm not sure.

Q. Could it be junior operator?

A. Possibly.

Q. And in 2013 at PWT, what was the title of a Level 4 well test employee?

MR. HARVEY: Same objection.

A. I'm not sure.

Q. Could it be lead operator assistant?

A. Possibly.

Q. Russell Bird would be the best person to talk about that?

A. Yes.

Q. Now, you said that in 2013 PWT had a written job description for a Level 5 employee?

A. I believe so.

Q. And when was that written?

A. I'm not sure.

Q. So you don't know whether it was written in May of 2013 or any other time in 2013?

A. I don't know the specific dates.

Q. Do you know who wrote the job descriptions?

A. It would have been formed with input from Russell Bird.

Q. Do you know whether the job descriptions were provided to the employees at the beginning or during their employment?

A. I'm not familiar with the packet that was given to the employees at the time of hire.

Q. Do you know whether the employees were required to sign an acknowledgement form that they received a copy of their job description?

A. I know they had to sign a receiving copy of the new hire paperwork, I believe, specifically with the handbook, but, again, I'm not familiar with what was all given to them.

Q. As you sit here today, can you tell us what the difference is between the duties and responsibilities of a Level 5 lead operator and the duties and responsibilities of a Level 6 senior operator?

A. A Level 6 senior operator was expected to take ownership of the job, responsible for staffing, responsible for surveying the project,
ensuring the tools and equipment was in proper working order and the quantity was available, had direct contact with the company representative, was responsible for the paperwork, was responsible for documenting the work done on-site, the employees that were present, was responsible for filling out the daily

6

monitoring reports for the customer. The Level 5 was generally just a field hand that was on his way up.

Q. So the duties that you have just described for a Level 6, none of those duties were handled by a Level 5?

A. Not normally.

Q. But they were sometimes?

A. I'm not sure.

Q. Well, you said "not normally." Is it not normally, or is it you're not sure?

A. Without being intricately involved in what happened on every job, I do not know.

Q. Would Russell Bird have more knowledge than you regarding that aspect of the work?

A. Yes.

Duplechin dep. 37:3-41:24

As reflected in Ex. E, Priority 1713-16 and 1717-20, there are no differences in job duties and responsibilities for a level 5 and level 6 operator.

8. PARAGRAPH 6. "Mr. Harris was responsible for the day-to-day direction of his crew and each of his well testing jobs, such as choosing the members of his crew and necessary equipment for the job, communicating with the Company regarding the progress of the well testing jobs he managed. To the extent Mr. Harris performed any manual work similar to that of his crew members, it would necessarily have been in connection with and in support of his management duties." In addition to the testimony quoted above which reflects that the witness does not have personal knowledge sufficient to make the statements he made in paragraph 6, Harris testified that "most of the time, they would pull somebody off from you, and you would

7

be out there by yourself." Harris dep. 109:10-19. He also made it clear that he did not have supervisory or management duties.

> Q. Start from the top, work your way through. And anytime you see something that you disagree with, I want you to point it out to me.
>
> A. Okay.
> (Pause)
> A. Okay. So when it says, "Must be able to successfully lead a crew to 10" -- "two to 10 people." Right there, I mean, you don't have a crew to 10 -- two 9 to 10 people out there.
>
> Q. Okay.
>
> A. Sometimes you might. Sometimes you might not. But they're all your equals. You're not their supervisor.
>
> Q. So when Priority tells you that you need to be able to successfully -- be able to lead a crew of two to 10 personnel, you think that that's inaccurate, that you don't need to have that ability in order to do that job?
>
> A. No, I'm not saying that you don't need to have that ability. But what I'm saying is, you're not a supervisor out there. Then right here, this is pretty much telling you you're the supervision on – management on the location, and you're not.

Harris dep. 171:1-22

9. PARAGRAPH 7. Duplechin testified in his deposition that he had no personal knowledge of any employees who were recommended by Harris for hiring or firing:

> Q. My question is with regard to hiring an individual to work for Priority, not asking an individual who's already an employee to come onto the well pad. So with regard to hiring an employee to work for Priority Well Test, does a Level 6 senior operator, in this case Harris or Allen, can he make the decision to hire an employee to come to work for Priority?
>
> A. A lot of times these levels will have crews that work for them and they will go from company to company. So if a Level 6 senior
> operator has a -- is offered a project, a job, and he says, I have a bunch of people that work for me, we work well, we come as a crew, yes, he could hire the people.
>
> Q. And can you give me the name of one employee who Micheal Allen hired while he was with PWT?

8

A. I'm not familiar with exactly what he's done.

Q. Can you give me the name of one employee that was hired by Nathan Harris while he was a senior operator at PWT?

A. I'm not familiar with any.

Q. Can you give me the name of one employee who was fired by Micheal Allen while he was a senior operator at PWT?

A. I'm not familiar with any.

Q. And can you give me the name of one employee who was fired by Nathan Harris while he was a senior operator at PWT?

A. I'm not familiar with any.

Q. Can you give me the name of one employee who Micheal Allen recommended PWT hired who was hired?

A. That would be his direct supervisor's, direct manager's knowledge. I don't know.

Q. And would your answer be the same for Mr. Harris?

A. It would.

Duplechin dep. at 73:3 – 74:17.

10. The specific portions of Duplechin's declaration highlighted in Ex. A are not based on the witness' personal knowledge, do not set forth facts that would be admissible in evidence, and reflect that the witness is not competent to testify on those matters. These portions are conclusory, unsubstantiated assertions that cannot be used to support Defendants' motion. *Sedgwich James*, 276 F.3d at 759. The court should strike those portions of the declaration that do not meet the requirements of FRCP 56(c)(4).

## Conclusion

Plaintiff, Nathan Scott Harris, respectfully prays that the court strike the highlighted portions of Alex Duplechin's declaration attached as Ex. A.

Respectfully submitted,

*/s/Robert J. Filteau*
Robert J. Filteau
State Bar No. 06997300
rfilteau@fso-lawprac.com
9894 Bissonnet Street, Suite 865
Houston, Texas 77036
(713) 236-1400 Telephone
(713) 236-1706 Telecopier

**ATTORNEY FOR PLAINTIFFS**

**OF COUNSEL:**

John A. Sullivan III
State Bar No. 19483500
jsullivan@fso-lawprac.com

and

THE LAW OFFICES OF FILTEAU & SULLIVAN, LTD., LLP
9894 Bissonnet Street, Suite 865
Houston, Texas 77036
(713) 236-1400 Telephone
(713) 236-1706 Telecopier

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the attached Plaintiff Nathan Scott Harris' Motion to Strike has been forwarded to all counsel of record, via filing on the Court's electronic filing system and/or facsimile this the 15th day of May, 2017 as follows:

Daniel Pipitone
Michael Harvey
Brenna Hill
Munsch Hardt Kopf & Harr, P.C.
700 Milam Street, Suite 2700
Houston, Texas 77002

*/s/Robert J. Filteau*
Robert J. Filteau